UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

| | |
|---|---|
| **CROSBY DREDGING L L C** | **CASE NO. 2:18-CV-01645** |
| **VERSUS** | **JUDGE SUMMERHAYS** |
| **I F G PORT HOLDINGS L L C** | **MAGISTRATE JUDGE KAY** |

MEMORANDUM RULING

Presently before the Court are (1) Crosby Dredging LLC's Motion for Summary Judgment ("Crosby Motion") [ECF No. 19] and (2) IFG's Motion for Summary Judgment ("IFG Motion") [ECF No. 20]. For the following reasons, the Crosby Motion is **DENIED** and the IFG Motion is **GRANTED**.

I.
BACKGROUND

On May 3, 2017, Mark Coyle, a marine consultant for Crosby Dredging LLC ("Crosby") sent an email to the Port of Lake Charles inquiring about an upcoming dredging project of IFG Port Holdings, LLC ("IFG").[1] Eventually, Mr. Coyle contacted IFG CEO Kabir Ahmad. Mr. Coyle and Mr. Ahmad began discussing the project and the possibility of Crosby performing the dredging work.[2] On May 10, 2012, Mr. Ahmad sent Mr. Coyle various documents to prepare a bid proposal, including stamped drawings, a survey, permit modification letter from the USACE and a USCE letter to the Port of Lake Charles, and the dredging permit.[3] In the weeks that followed, various

---

[1] May 3, 2017 Email from Coyle to McGinnies, [ECF No. 20, Ex. 1].
[2] Affidavit of Kabir Ahmad, CEO of IFG ("Ahmad Affidavit").
[3] May 10, 2017 Email from Ahmad to Coyle with attachments [ECF No. 20, Ex], *See also* Ahmad Affidavit.

proposals were sent by Crosby to IFG. Ultimately, Crosby offered IFG a reduced cost because of the fact that it was seeking other dredging work in the area.[4] The parties then began negotiating and drafting the actual Dredging Agreement. Starting on June 19, 2017, the parties negotiated the terms and conditions of the Dredging Agreement and exchanged various redline drafts. Specific comments and input were provided by Roland Maturin, the Crosby project manager who was going to be in charge of the IFG project. Comments and drafts were sent back to Mr. Ahmad through Mr. Coyle.[5] The Dredging Agreement, dated July 11, 2017, was executed by IFG CEO Kabir Ahmad and Crosby CFO Farrell Trosclair.[6] The Dredging Agreement includes the following pertinent provisions:

> **Section 2: Related to Mobilization**
>
> IFG shall pay to Contractor, as full contribution for the faithful performance by Contractor of the aforementioned dredging work within 30 days of completion of the dredging work in accordance with the Contract Documents and acceptance of the work by IFG. With respect to mobilization only, IFG shall pay the Contractor 60% of the mobilization cost (total mobilization cost will be $165,000.00 as per Contractor's proposal and 60% is equal to $99,000.00) within 7 days of the Contractor giving IFG written notice that mobilization is fully complete to allow for dredging to commence in accordance with the Contract Documents.
>
> **Section 3: Related to Commencement of Work and Written Notice to Proceed**
>
> The Contractor agrees to commence the work upon receipt of a notice to proceed from IFG (notice to proceed form is attached as Exhibit C) and thereafter work continuously for a period of up to 30 days to fully complete the work in accordance with the Contract Documents. The parties hereto agree that time is of the essence.

---

[4] Revised proposal with transmittal email from Coyle to Ahmad [ECF No. 20, Ex. 3]; Final proposal with transmittal email from Coyle to Ahmad [ECF No. 20, Ex. 4]
[5] Draft dredging agreement with Crosby comments [ECF No. 20, Ex. 5]; Late June email exchange between Ahmad and Coyle [ECF No. 20, Ex. 6]; July 10, 2017 redline draft dredging agreement with transmittal emails [ECF No. 20, Ex. 7]; Mark Coyle depo P. 13 [ECF No. 20, Ex. 32]; Kabir Ahmad depo P. 20-26 [ECF No. 20, Ex. 36]; Roland Maturin depo P. 13 [ECF No. 20, Ex. 40].
[6] Dredging agreement dated July 11, 2017 (fully executed) [ECF No. 20, Ex. 9]; Ex 30. Kurt Crosby depo P. 8 [ECF No. 20, Ex. 30].

**Section 9: Related to Standby Time Standby Time.**

Any Standby Time incurred by the Contractor and charged in accordance with the Contractor's proposal will be applicable only to the extent the Contractor is incapable of performing of the Dredging Work and must halt all work due to matters outside the Contractor's control such as debris encountered in the dredging area. However if the Contractor is capable of continuing to perform the Dredging Work outside the affected area no Standby Time will accrue, in case Standby Time does accrue, Contractor will immediately give written notice to IFG informing IFG of the cause of the Standby Time and the expected length of time. Standby Time is only intended for period of less than 12 hours, any Standby Time greater than this be reviewed and agreed by the Contractor and IFG in writing executed by the parties hereto.

**Section 11: Related to the Modification of the Agreement Modification.**

No oral agreement, statement, promise, undertaking, understanding, arrangement, and or omission of any Party, occurring subsequent to the date hereof may be deemed an amendment or modification of the Agreement unless reduced to writing and signed by the Parties hereto or their respective successors or assigns. This Agreement shall be construed as if the Parties jointly prepared it, and say any uncertainty or ambiguity shall not be interpreted against any one Party.

The Dredging Agreement also includes various Exhibits, namely:

(1) Exhibit A: The map of the dredging area.

(2) Exhibit B: The permits, plans, and drawings for the project.

(3) Exhibit C: Written Notice to Proceed form.[7]

Approximately one week prior to the execution of the Dredging Agreement, on July 3, 2017, Mr. Ahmad emailed Tracy Falk, Operations Manager with the USACE, New Orleans Office, to inquire about the availability of the dredge spoil area in order to confirm an approximate start date for the dredging to begin.[8] On July 5, 2017, Mrs. Falk responded to Mr. Ahmad in an email stating that "the contractor completed the dike work on 20 Jun 17. Our dredging contractor plans

---

[7] ECF No. 20, Ex. 9.
[8] Ahmad email exchange with Faulk July 3-5, 2017 [ECF No. 20, Ex. 10]

3

to have the dredge working in Clooney Island Loop at the beginning of August, and we have about 2 to 3 weeks of dredging."[9] Upon receiving this response from the USACE, Mr. Ahmad immediately forwarded the email exchange to his primary contact person with Crosby, Mr. Mark Coyle.[10]

On or about July 10, 2019 – *before* the Dredging Agreement was executed – Crosby equipment and personnel arrived at the Port of Lake Charles. In order for Crosby to transport its equipment to the site at the Port of Lake Charles by July 10, 2019, Crosby had to depart its previous work site in the Houston area several days before the 10th.[11] According to Crosby's representatives, a "pre-dredge" meeting was held on July 12, 2019. The meeting attendees included Mark Coyle, Crosby's marine consultant, Roland Maturin, Crosby's operations manager, and Philip Rogers.[12] Crosby's representatives state that during the pre-dredge meeting, Rogers verbally instructed Crosby to mobilize.[13] According to both IFG and Philip Rogers, Mr. Rogers is not an employee or representative of IFG.[14]

On August 1, 2017, Mr. Mark Coyle emailed IFG to inform them that Crosby had finally secured other work and was going to start work on a nearby project under another contract. This nearby project was located at the Rain C2 Carbon dock a few miles down the Calcasieu River. Crosby subsequently departed the vicinity of the IFG work site in order to perform work at the Rain C2 Carbon facility[15] Mr. Coyle also stated that he had yet to hear from Mike Hooks or the

---

[9] *Id.*
[10] *Id;* Mark Coyle forwarded the Ahmad/Faulk exchange to Roland Maturin on July 17, 2017.
[11] Roland Maturin depo P. 40 & P. 91 [ECF No. 20, Ex. 42]
[12] Deposition of Roland Maturin, page 33 [ECF No. 19, Ex. D].
[13] *Id.,* at page 33.
[14] *See* ECF No. 20, Ex. 3 and 4.
[15] August 1, 2017 E-mail from Coyle to Ahmad [ECF No. 20, Ex. 13].

USACE on the status of their work and requested any "updated information" from IFG.[16] Mr. Ahmad responded later that day via email stating, "Based on the schedule guidance provided by the USACE on July 5 which I forwarded to you on the same day (see below), there isn't any change in the timing provided by the USACE that I'm aware of. Please feel free to call me to discuss."[17] Crosby ultimately left the vicinity of the IFG work site on or about August 2, 2012 without ever mobilizing or commencing the dredging for IFG, in order to perform work at the Rain C2 Carbon facility. At no point did Crosby provide IFG written notice that mobilization was fully complete in accordance with Section 2 of the Dredging Agreement.[18]

Shortly after Crosby left the vicinity of the IFG work site, Mr. Ahmad of IFG agreed to meet with representatives from Crosby to discuss the matter of certain costs, which had first been raised by Mr. Coyle in his August 1, 2017 e-mail.[19] Mr. Ahmad met with Crosby personnel in Houston on August 15, 2017.[20] At that meeting, Crosby representatives initially claimed that Crosby had earned "Standby Time" during the period that the Crosby work crew chose to remain in the vicinity of the IFG work site. However, over the course of the meeting, Crosby ultimately acknowledged that, in fact, no recoverable Standby Time had accrued to date.[21]

Two days after the meeting, on August 17, 2017, Mr. Ahmad e-mailed Mr. Maturin, as well as other Crosby managers and personnel, a draft amendment to the Dredging Agreement.[22] In that e-mail, Mr. Ahmad reminded Crosby that "no modification of the Dredging Agreement is

---

[16] Id.

[17] August 1, 2017 Email from Ahmad to Coyle [ECF No. 20, Ex. 29].
[18] Ex. 34 to Document 20, Mark Coyle depo P. 99-101 [ECF No. 20, Ex. 34]; Mark Coyle depo P. 122-23 [ECF No. 20, Ex. 35]; Roland Maturin depo P. 89-90 [ECF No. 20, Ex. 46].
[19] Email exchange related to August 15, 2017 Houston meeting [ECF No. 20, Ex. 14].
[20] See Ahmad Affidavit; Roland Maturin depo P. 50 [ECF No. 20, Ex. 43].
[21] See Ahmad Affidavit.
[22] August 17, 2017 email from Ahmad to Maturin with draft Amendment [ECF No. 20, Ex. 15].

effective unless such modification is made by a written document which is executed by both parties."[23] Both parties executed the final version of the Amendment effective August 22, 2017.[24] The Amendment incorporated the terms that the parties agreed to during the August 15, 2017 meeting; specifically their agreement to amend the Standby Time provisions of the Dredging Agreement (Section 9) and Exhibit B to the Dredging Agreement.

This Amendment provides for a lump sum Standby Time charge of $180,000, and includes the cost and expenses for retrieving any debris (including but not limited to aluminum T-bars) encountered in the dredge area during the performance of Crosby's dredging work. Reflecting the fact that Crosby had not earned any Standby Time charges to date, the Amendment states that "[n]o other Standby Time is or will be charged under any circumstances."[25] According to IFG, the purpose of these specific provisions and the Amendment in general was to resolve the parties' disputes over the alleged accrual of Standby Time charges for Crosby's early arrival at the work site and to prevent any future disagreements. The Amendment further states that the Lump Sum Standby Charge would only be due and payable after Crosby is fully mobilized to allow for dredging to commence in accordance with the Contract documents. Specifically, the Amendment states:

> It is agreed that with respect to the Lump Sum Standby Charge only, IFG shall pay the Contractor 60% of the Lump Sum Standby Charge (60% - $108,000.00) within 7 days of the Contractor giving IFG an(sic) invoice and written notice that it is fully mobilized to allow for dredging to commence in accordance with the Contract Documents.[26]

---

[23] *Id.*
[24] Amendment dated August 22, 2017 (fully executed) [ECF No. 20, Ex. 16].
[25] *Id.*
[26] *Id.*

IFG continued to communicate with the USACE to determine when the USACE/Mike Hooks work would be completed so that the IFG dredging could commence. On August 8, 2017, Mrs. Falk advised Mr. Ahmad that she expected the project to be "finished by August 21, 2017, pending down time due to weather or other issues." This information was relayed to Crosby on August 8, 2017.[27] After receiving notice from the USACE that its project could proceed, on September 6, 2017, IFG issued a Notice to Proceed to Crosby in accordance with the Dredging Agreement.[28] Shortly thereafter, Mr. Farrel Trosclair, Crosby's CFO, signed the Notice to Proceed, acknowledging that Crosby would complete the dredging work within 30 days.[29]

Over the next 30 days, IFG followed-up with Crosby to ensure Crosby was on track to complete the dredging in accordance with the Agreement.[30] By late September, Crosby had completed or was nearly complete with the Rain C2 Carbon project.

On September 27, 2017, Mr. Maturin inquired about some alleged unpaid invoice for "Mob/Standby time."[31] Later that day, Mr. Ahmad responded by e-mail rejecting the idea that any amounts were owed, and he quoted the applicable language of the Amendment.[32] On October 3, 2017, Mr. Maturin indicated that the invoice needed to be cleared before Crosby would move to IFG's site.[33] On October 5, 2017, Roland Maturin of Crosby spoke by phone to Mr. Ahmad and

---

[27] August 7-8, 2017 email exchange between Ahmad and Faulk forwarded to Coyle on August 8, 2017 [ECF No. 20, Ex. 17].
[28] Notice to Proceed dated September 6, 2017 counter executed by Crosby September 18, 2017 [ECF No. 20, Ex. 18].
[29] *Id.*
[30] September 25, 2017 email from Ahmad to Maturin requesting mobilization update [ECF No. 20, Ex. 19]; September 27, 2017 email from Ahmad to Maturin requesting confirmation of mobilization start [ECF No. 20, Ex. 20]; September 27, 2017 follow up email from Ahmad to Maturin [ECF No. 20, Ex. 21]; September 27, 2017 email from Ahmad to Maturin with contract quote [ECF No. 20, Ex. 22]; October 3, 2017 email from Maturin to Ahmad regarding invoice payment [ECF No. 20, Ex. 23].
[31] September 27, 2017 email from Ahmad to Maturin with contract quote [ECF No. 20, Ex. 22].
[32] *Id.*
[33] October 3, 2017 email from Maturin to Ahmad regarding invoice payment [ECF No. 20, Ex. 23].

again demanded that IFG pay Crosby before Crosby mobilized to the site.[34] Mr. Ahmad stated that this demand was not in accordance with the Dredging Agreement, as amended, and pointed out that Crosby had never sent an invoice to IFG.[35] Mr. Maturin initially claimed that the invoice was sent by mail then later claimed that the invoice had been sent by email to IFG on August 31, 2017. IFG asserts that it has no record of ever receiving the invoice prior to October 5, 2017.[36] Shortly after this call on October 5, 2017, Mr. Maturin emailed an invoice to IFG in the total amount of $279,000.00 ($99,000 for Mobilization and $180,000 for Standby Time).[37] Crosby never returned to IFG's work site.[38]

## II.
## LAW AND ANALYSIS

### A. Summary Judgment Standard.

Summary judgment is proper if the pleadings, discovery products on file, and affidavits show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The purpose of summary judgment is to pierce the pleadings, to assess the proof, and to determine whether there is a genuine need for trial.[39] Summary judgment procedure is designed to isolate and dispose of factually unsupported claims or defenses.[40] If the movant bears the burden of persuasion at trial on a claim or defense addressed in the motion for summary judgment, the movant must establish that there is no genuine dispute of material fact as to those claims or defenses. To satisfy this burden, the movant must come

---

[34] Roland Maturin depo P. 58 ("I said that we're not coming back till we get paid") [ECF No. 20, Ex. 48].
[35] Ahmed Affidavit.
[36] *Id.*
[37] October 5, 2017 email from Maturin to Ahmad with invoice [ECF No. 20, Ex. 24].
[38] See Ahmad Affidavit.
[39] *See Matsushita Electric Industries v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).
[40] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

forward with competent summary judgment evidence conclusively establishing that no reasonable trier of fact could find other than for the moving party.[41] To avoid summary judgment, the non-movant must then come forward with evidence showing that there is a genuine dispute of material fact.

If the non-moving party has the burden of persuasion at trial with respect to an issue addressed in the motion for summary judgment, the moving party may satisfy its initial burden by either (1) demonstrating affirmatively that there is no triable issue of fact as to each element of the non-moving party's affirmative defenses or claims, or (2) "showing" that the non-moving party cannot present evidence sufficient to satisfy the essential elements of its defenses or claims and thus cannot meet its burden of persuasion at trial.[42] If the moving party makes a showing that there is "no evidence" to support the non-moving party's claims or defenses, the non-moving party must come forward with "substantial" evidence showing a genuine dispute of material fact with respect to each essential element of its affirmative defenses or claims.[43] Substantial evidence for purposes of defeating summary judgment is evidence sufficient to support a jury verdict in the non-movant's favor.[44] Under this standard, the non-movant cannot rely on unsupported assertions or arguments, but must submit sufficiently probative evidence supporting its claims or defenses. Even if the burden shifts to the non-moving party, the movant still retains the ultimate burden of persuasion on the motion for summary judgment.[45]

---

[41] See Calderone v. United States, 799 F.2d 254, 259 (6th Cir.1986).
[42] Celotex Corp., 477 U.S. at 324–326, 106 S.Ct. 2548.
[43] Id.
[44] See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249–252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).
[45] Celotex Corp., 477 U.S. at 330–331, 106 S.Ct. 2548.

In considering a summary judgment motion, "the court must disregard all evidence favorable to the moving party that the jury is not required to believe and should give credence to the evidence favoring the nonmoving party as well as that evidence supporting the moving party that is uncontradicted and unimpeached."[46] "Credibility determinations are not part of the summary judgment analysis."[47] Rule 56 "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof."[48]

**B. Breach of Contract.**

In Louisiana, a breach-of-contract claim has three "essential" elements: "(1) the obligor's undertaking an obligation to perform, (2) the obligor failed to perform the obligation (the breach), and (3) the failure to perform resulted in damages to the obligee."[49] The first two elements of a breach-of-contract claim, obligation and breach, involve issues of both contractual interpretation as a matter of law, as well as questions of fact regarding whether the actions of the parties actually constituted the alleged breach under the applicable contractual terms.[50] Under article 1994 of the Louisiana Civil Code, "[a]n obligor is liable for the damages caused by his failure to perform a

---

[46] *Roberts v. Cardinal Servs.*, 266 F.3d 368, 373 (5th Cir.2001); *see also Feist v. Louisiana, Dept. of Justice, Office of the Atty. Gen.*, 730 F.3d 450, 452 (5th Cir. 2013) (court must view all facts and evidence in the light most favorable to the non-moving party).
[47] *Quorum Health Resources, L.L.C. v. Maverick County Hosp. Dist.*, 308 F.3d 451, 458 (5th Cir. 2002).
[48] *Patrick v. Ridge*, 394 F.3d 311, 315 (5th Cir. 2004) (alterations in original) (quoting *Celotex v. Catrett*, 477 U.S. 317, 322 (1986)).
[49] *IberiaBank v. Broussard*, 907 F.3d 826 (5th Cir. 10/25/18), citing *Favrot v. Favrot*, 68 So.3d 1099, 1108–09 (La. App. 4 Cir. 2011).
[50] *IberiaBank v. Broussard*, 907 F.3d 835, citing *Mobil Expl. & Producing U.S. Inc. v. Certain Underwriters Subscribing to Cover Note 95-3317(A)*, 837 So.2d 11, 26 (La. App. 1 Cir. 2002). The third element, damages, is a question of fact. *LAD Servs. of La., L.L.C. v. Superior Derrick Servs., L.L.C.*, 167 So.3d 746, 762 (La. App. 1 Cir. 2014).

conventional obligation." "Damages are measured by the loss sustained by the obligee and the profit of which he has been deprived."[51]

Under the Louisiana Civil Code, contracts have the force of law between the parties, and the courts are bound to interpret them according to the common intent of the parties.[52] "Good faith shall govern the conduct of the obligor and the obligee in whatever pertains to the obligation."[53] Moreover, "[c]ontracts must be performed in good faith."[54] "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent."[55] Stated another way, when such a contract is written, "'[t]he meaning and intent of the parties... is ordinarily determined from the instrument's four corners, and extrinsic evidence is inadmissible either to explain or to contradict the instrument's terms."[56] The Louisiana Supreme Court has stated that, when a clause in a contract is clear and unambiguous, "the letter of that clause should not be disregarded under pretext of pursuing its spirit."[57]

Louisiana law is well settled that: (1) "when a contract is not ambiguous or does not lead to absurd consequences, it will be enforced as written and its interpretation is a question of law for a court to decide;"[58] and (2) "when a contract can be construed from the four corners of the instrument…, the question of contractual interpretation is answered as a matter of law and

---

[51] La. Civ. Code art. 1995.
[52] La. Civ. Code Ann. arts. 1983 and 2045.
[53] La. Civ. Code Ann. art. 1759.
[54] La. Civ. Code Ann. art. 1983.
[55] La. Civ. Code Ann. art. 2046; *See also Derouen v. Nelson*, 2009-467 (La. App. 3 Cir. 3/10/10); 32 So. 3d 1079, 1082 (citing La. Civ. Code arts. 2045 & 2046) (finding that if the words of the contract are clear, unambiguous, and lead to no absurd consequences, courts are forbidden from looking beyond the language of the contract to determine the true intent of the parties).
[56] *Olympia Minerals, LLC v. HS Res., Inc.*, 2013-2637 (La. 10/15/14), 171 So. 3d 878, 887.
[57] *Maloney v. Oak Builders, Inc.*, 256 La. 85, 98 (1970).
[58] *Am. Deposit Ins. Co. v. Myles*, 2000–2457 (La. 4/25/01), 783 So. 2d 1282, 1286; *see also Associated Acquisitions, L.L.C. v. Carbone Properties of Audubon, L.L.C.*, 2007–0120, (La. App. 4 Cir. 7/11/07), 962 So. 2d 1102, 1106; *Abshire v. Vermilion Par. Sch. Bd.*, 2002–2881 (La. 6/27/03), 848 So. 2d 552, 555.

summary judgment is appropriate."[59] Additionally, "[t]he words of a contract must be given their generally prevailing meaning," and "[w]ords susceptible of different meanings must be interpreted as having the meaning that best conforms to the object of the contract" and "with a meaning that renders it effective and not with one that renders it ineffective."[60] Moreover, "[e]ach provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole.[61]

In the instant case, there is no dispute regarding the fact that IFG did not send a written Notice to Proceed to Crosby until September 6, 2017 and that Crosby never returned to the site after that September 6th notice was sent. The issue regarding whether there was a Notice to Proceed is significant as no sums can possibly be due from IFG to Crosby until that occurs. The Dredging Agreement clearly requires a written Notice to Proceed before any mobilization costs are due from IFG to Crosby.[62] Crosby, however, argues that they received a verbal notice to proceed from IFG.

The Dredging Agreement is clear and unambiguous that a written Notice to Proceed is required before any sums would be due from IFG. In addition to the specific terms of the Dredging Agreement, the agreement included as an exhibit the actual form that the parties intended to use for the written Notice to Proceed. However, even if the Court were to conclude that no written Notice to Proceed was required, the evidence before the Court clearly establishes that no "verbal" Notice to Proceed was ever provided.

Crosby argues that verbal notice came from Phillip Rogers, who Crosby claims was a representative of IFG. Crosby claims that Kabir Ahmad informed them that Mr. Rogers was their

---

[59] *Olympia Minerals, LLC v. HS Res., Inc.*, 171 So. 3d at 891.
[60] La. Civ. Code Ann. art. 2050.
[61] *Shell Offshore, Inc. v. Marr*, 916 F.2d 1040, 1046 (5th Cir. 1990).
[62] Dredging agreement dated July 11, 2017, Section 2 [ECF No. 20, Ex. 9].

representative on the project and in two separate pleadings cites the deposition of Mr. Ahmad to support this allegation.[63] However, in each instance, there is no deposition of Mr. Ahmad attached even though it is specifically referred to with a specific exhibit number. IFG has attached portions of a deposition of Mr. Ahmad to their pleadings, in which Mr. Ahmad clearly denies ever informing anyone with Crosby that Mr. Rogers was an employee or representative of Mr. Rogers.[64] IFG even points to the fact that no deposition of Mr. Ahmad is attached to Crosby's motion in its objection.[65] Despite this, when Crosby filed a reply to that opposition, it still failed to include a copy of the deposition to support their allegation that Mr. Ahmad advised them that Mr. Rogers was a representative of IFG.

Further, the affidavits of both Mr. Ahmad and Mr. Rogers clearly indicate that the only involvement from Mr. Rogers was that he showed the Crosby representatives around the port when they arrived early. The Court finds that there is no evidence in the record to support Crosby's claim that Mr. Rogers was a representative of IFG who had any authority to give Crosby a Notice to Proceed. In addition, the meeting at which Crosby claims that Mr. Rogers gave them this verbal authority occurred on July 12, two days *after* Crosby had allegedly mobilized and arrived at the port. It is unclear how Crosby can argue that its directive and authority to mobilize under the contract occurred *after* they had already mobilized.

Finally, the Amendment to the Dredging Agreement executed by the parties on August 22, 2017 was intended to clarify and resolve any dispute regarding Crosby's disputed Standby Time charges and mobilization costs. That Amendment provided for a lump sum "standby charge" only

---

[63] *See* ECF No.19, page 2, fn. 8 and ECF No.22, page 5, fn. 5.
[64] ECF No. 20, Ex. 36, 37, 38 and 39.
[65] ECF No. 23, page 8.

and further provided that IFG would pay sixty percent of that sum "within 7 days of the Contractor giving IFG an invoice and written notice that it is fully mobilized to allow for dredging to commence in accordance with the Contract Documents." This provision thus was not triggered until Crosby mobilized. No invoice was provided by Crosby until October 5, 2017 and Crosby never provided a written notice that it was fully mobilized to proceed with the contract.

As there was never any Notice to Proceed under the Dredging Agreement or the Dredging Amendment, no sums were ever owed by IFG to Crosby under the Dredging Agreement or Amendment and Crosby has failed to establish an essential element of their claim for breach of contract. Accordingly, the Motion for Summary Judgment filed by Crosby is DENIED; the Motion for Summary Judgment filed by IFG is GRANTED and all claims are hereby DISMISSED WITH PREJUDICE.

THUS DONE in Chambers on this 25th day of September, 2020.

Robert R. Summerhays
United States District Judge